AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3738 Isabella Avenue<br>Cincinnati, Ohio, 45209 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  **1:25-MJ-00559**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2314 | Interstate Transportation of Stolen Property; |
| 18 U.S.C. § 1028 (A) | Aggravated Identification Fraud. |

The application is based on these facts:
See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under* 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Peter Chiglinsky, Special Agent FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Facetime video conference _____ *(specify reliable electronic means).*

Date:  **Jul 2, 2025**

_____
*Judge's signature*

City and state:  Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A
### Property to Be Searched

The property to be searched is 3738 Isabella Avenue, Cincinnati, Ohio 45209 pictured below and further described as a single-family residence. The exterior of the residence is a red brick siding with small covered front porch. There are green colored shutters surrounding the exterior windows. There is a number "3738" affixed to the front of the subject residence.

The authorization includes any safes or other containers found, whether locked or unlocked; any storage areas, garages, and/or outbuildings; and/or any vehicles located in the driveway/curtilage of the property.



**ATTACHMENT B**

**Particular Things to be Seized**

1.  Computer(s), cellphone(s), tablet(s), computer hardware (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, diskettes, and other memory storage devices), computer software, computer related documentation, computer passwords and data security devices, which may contain evidence of the alleged offenses;

2.  Any and all notes, documents, ledgers, bank account records, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the alleged offenses;

3.  Any and all vehicles located at the subject residence which are identified as stolen;

4.  3-D printers or medium used to support 3-D printers which could be involved in the alleged offenses;

5.  US currency possibly associated with the sale of stolen vehicles;

6.  Counterfeit currency;

7.  State identification cards, counterfeit automotive titles, counterfeit VINs;

8.  Machines and tools used for the production of VIN plates and stickers;

9.  Non-serialized/"ghost guns"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| IN THE MATTER OF THE SEARCH OF<br>3738 Isabella Avenue<br>Cincinnati, Ohio, 45209 | Case No. **1:25-MJ-00559**<br><br>**Filed Under Seal** |

## AFFIDAVIT

I, Peter Chiglinsky, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premise. further described in Attachments A for the things described in Attachment B:

| Premises to be Searched | Attachment |
|---|---|
| 3738 Isabella Avenue, Cincinnati, Ohio, 45209 (Subject Residence) | A |

2. I have been employed as a Special Agent with the FBI since January 2021 and am currently assigned to the Violent Crimes squad of the Cincinnati Field Office. In this capacity, I investigate a variety of violent crimes, to include but not limited to drug trafficking, interstate transport of stolen property, and other various violent federal offenses. Since 2021, I have received training and experience in interview and interrogation techniques, arrest procedures, search warrants, and various other investigative techniques.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2314 - Interstate Transportation of Stolen Property, and 18 U.S.C. § 1028 (A) – Aggravated Identification Fraud, the "subject offenses", have been committed by Cole WATSON.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

**PROBABLE CAUSE**

5.      On April 28, 2025, the Fairfax Police Department (Ohio) provided FBI Cincinnati with information and evidence to suggest that Noah MART, Raymond LIZAK, and Cole WATSON, among others yet to be identified, are involved in a criminal scheme to steal luxury vehicles, fraudulently re-title the vehicles, and either sell those vehicles out-of-state or dismantle the stolen vehicles and sell the parts for profit.

6.      Fairfax PD identified LIZAK, MART, WATSON, and others yet to be identified, have previously been and are currently still involved in a scheme to steal luxury vehicles, often times from locations not within Ohio – in numerous instances stealing vehicles from Texas. Upon stealing those vehicles, LIZAK, MART, WATSON, and others yet to be identified, transport those vehicles to Ohio, often times parking the stolen vehicles in a detached two car garage located at 3738 Isabella Avenue, Cincinnati, Ohio, 45209 (hereafter "THE SUBJECT RESIDENCE"). Once parked at THE SUBJECT RESIDENCE, WATSON, LIZAK, MART, and others yet to be identified produce fraudulent Vehicle Identification Numbers (VINs) and fraudulent vehicle titles and affix the fraudulent VINs to the stolen vehicles.

7.      More specifically, on September 20th, 2024, local law enforcement was requested by the Ohio Bureau of Motor Vehicles (BMV) and Title Office, located at 3370 Red Bank Road, Cincinnati, Ohio, to investigate possible fraudulent Texas titles which had been passed by LIZAK

2

and MART. LIZAK and MART both provided titles which were confirmed to be fraudulent by the Ohio BMV and the Texas Department of Motor Vehicles (DMV). After receiving new Ohio titles in their names for a green 2024 BMW M4 and a red 2023 BMW M3, LIZAK and MART proceeded to the Registration Office where they registered the aforementioned vehicles with Ohio license plates. The manufacturer was contacted regarding the VINs on the aforementioned vehicles which were confirmed to be invalid, having never been produced by BMW. Additional contact with the manufacturer revealed that the fraudulent VINs closely resembled the VINs of two recently stolen BMWs. The 2024 green BMW M4 had a fraudulently created VIN of WBS43AZ01RCN39409, whereas the true VIN of the 2024 green BMW M4 was identified as WBS43AZ0XRCN39408. Similarly, the 2023 BMW M3 had a fraudulently created VIN of WBS43AY06PFN56218 whereas the true VIN of the 2023 BMW M3 had an identified true VIN of WBS43AY04PFN56217.

8. After confirming that the Titles and VINs were counterfeit, a search was performed for other recent Texas Titles, and on vehicles registered to LIZAK and MART. Two additional vehicles were discovered at this time, both Chevrolet Camaro SS, one titled to each. The black 2023 Chevrolet Camaro SS registered to MART was located in the driveway of his residence, 745 Wooster Pike, Cincinnati, Ohio, 45174. The vehicle was towed to Fairfax PD and searched after obtaining a State Search Warrant. A check of the Electronic Control Module (ECM) returned a different VIN than what was on the visible VIN stickers and was subsequently confirmed to have been stolen out of Norwood, Ohio. The blue 2022 Chevrolet Camaro SS registered to Raymond LIZAK showed a title cancellation and reissuance in Russell, Kentucky. The vehicle was sold to ███████. The Kentucky State Police responded to ██████ residence and checked the ECM on the vehicle, which returned a different VIN than was displayed on the title and VIN stickers. This vehicle was confirmed to have been stolen out of Rockwall, Texas. ██████ confirmed via

3

a photo lineup that Raymond LIZAK is the individual who met him and sold him the vehicle. The vehicle was also found to have been owned by Raymond LIZAK's friend, █████████, who lives in Rockwall, Texas. MART and LIZAK were subsequently charged with and indicted on multiple felony counts of Forgery, Tampering with Records, Receiving Stolen Property, and Counterfeiting.

9.      While conducting follow-up investigations on the suspects and their identified social media accounts, local law enforcement discovered that they were posting pictures of themselves in a BMW M5 Competition and a BMW M4 Competition. Raymond LIZAK was posting pictures of himself in the M5 with Pennsylvania license plates that did not match the standard Pennsylvania format. A traffic camera search was conducted by local law enforcement that showed a similar vehicle in Pennsylvania had a correctly formatted plate with the same Alpha Numerical identifiers, and the vehicles showed to be in two different locations at the same time. The vehicle was located and stopped for a traffic infraction. The operator of the vehicle was the suspect, Raymond LIZAK. The vehicle was impounded at the Fairfax Police Department's Evidence Bay, and search warrant was acquired. A scan of the ECM returned a different VIN than what was on the VIN plate and sticker. The vehicle as confirmed stolen out of Cincinnati. While conducting the search warrant of the vehicle, numerous 3CDC parking garage tickets were located. After checking surveillance footage matching those tickets, it was observed that the suspects drive in with the target vehicles. After parking, the suspects walk to the stolen vehicles and drive them out of the parking garage using the recent parking ticket in order to exit within the 10-minute grace period. This process is repeated when they return the stolen vehicles to the garage. Also located during the search warrant were tools for removing and swapping VINs and counterfeit VIN stickers for another BMW M4 printed off a Cricut machine, still attached to the backing. The key fob to the vehicle was taken to the BMW store where it was scanned to see its origin. The key fob

4

was not an original, but a replacement that had been ordered online through the BMW Store. A review of the order and its documents revealed a fraudulent order which was shipped to an abandoned house in Mariemont, Ohio. This key fob allowed the suspects to access the vehicle without forcing entry and allowing them to drive away. The BMW Store was asked to check additional online orders for key fobs. A suspicious order for a 2025 BMW M4 Gray/Black Matte was observed and when running the associated VIN, the vehicle was confirmed to have been stolen from Cincinnati, OH. The BMW store associates advised that the vehicle was a very rare model and color, with distinctive red interior. That order was shipped to THE SUBJECT RESIDENCE.

10. Additional posts by MART were located on Instagram where he was with a Matte Dark Gray/Black BMW M4 was red interior. Video was obtained for the theft offense of the BMW M4 and the vehicle was used to transport the suspects to the theft offense was a blue Chevrolet Camaro SS LT1 with customized exhaust tips. While performing surveillance of THE SUBJECT RESIDENCE, local law enforcement observed the target vehicles along with the Blue Camaro SS LT1, and the BMW M4. The inside of the garage was also determined to be the same as posted on LIZAK's Instagram, where the targets were upgrading the stolen BMW M5. Additional surveillance conducted by local law enforcement revealed that the targets and other known accomplices are at this location on a near daily basis, where they gather and have been observed working on vehicles which have been confirmed to be stolen. That current address is THE SUBJECT RESIDENCE.

11. An investigator with the Ohio Bureau of Motor Vehicles received information from the Title Office that a Kentucky title for a Blue Chevrolet Camaro SS LT1 had been canceled and reissued in Ohio. Kemba Credit Union was the lien holder for this vehicle and started investigating its whereabouts. The vehicle was confirmed to still be in Kentucky, but another vehicle was titled in Ohio with the same information. The cloned vehicle's owner and location were found in Toledo,

Ohio. The true VIN was found by checking the ECM, which did not match the Title, VIN plate, or VIN stickers. After backtracking the sales history of this vehicle, it was found that it had been posted on Facebook Marketplace. An auction company agreed to buy it from the seller, and met them in Union, Kentucky, where they purchased the vehicle with cash. The seller provided a Kentucky Driver's License with his picture on it, and the owner's name and information on the Driver's License was that of ███████████. An interview of ██████ confirmed that ████ is still in possession of the Camaro SS LT1, and that he was notified by Kemba Credit Union of fraudulent use of his Driver's License and vehicle title. The picture on the fraudulent Driver's License is confirmed to be of Cole WATSON, the resident of THE SUBJECT RESIDENCE. According to an interview with local law enforcement, the buyer recalls WATSON getting into what is believed to be the stolen BMW M4 after the sale. The buyer had pictures of the Chevrolet Camaro SS LT1 that had been posted on Facebook Marketplace, and the photographs have been confirmed to be taken in the garage of THE SUBJECT RESIDENCE. The Kentucky title used in the transaction was confirmed to be counterfeit by the Kentucky DMV and the Ohio BMV.

12. On or about June 6th, 2025, local law enforcement conducted surveillance of THE SUBJECT RESIDENCE, when a red 2023 BMW M3 was observed pulling into the driveway. This vehicle was driven into the garage, and the garage door was closed. This vehicle is believed to be the stolen BMW M3 which was last seen at the BMW store on September 20th, 2024, which initiated this investigation. Additional electronic surveillance showed what it believed to be the red 2023 BMW M3 being driven into THE SUBJECT RESIDENCE's garage on June 24th, 2025.

13. Additionally, it was found that MART was arrested by Cincinnati Police for an incident where he passed counterfeit currency and produced a counterfeit Kentucky Driver's License at a bar in Mt. Adams and fled to the stolen BMW M5. Two confidential informants also reported that LIZAK and MART were printing a large amount of counterfeit currency at an

unknown location. Also found while conducting search warrants were a 3D printed Glock replica "ghost gun" and a 3D printer.

## BACKGROUND REGARDING SEIZURE OF COMPUTERS

14. As stated, the investigation has determined that one or more computers (to include cellphones) have been used as an instrumentality in the course of, and in furtherance of, the offenses described above. Moreover, it is reasonable to believe that records and evidence are being stored in electronic form. This includes computer hard-drives, disks, CDs, modern cellphones and other similar electronic storage devices.

15. As indicated above, computer hardware is used to save copies of files and communications, while printers are used to make paper copies of same. Programs loaded on the drives are the means by which the computer can send, print and save those files and communications. Finally, password and security devices are often used to restrict access to or hide computer software, documentation or data. Each of these parts of the computer is thus integrated into the entire operation of a computer. In order to best evaluate the evidence, the computers—and all of the related computer equipment described above—should be available to a computer investigator/analyst.

*Forensic Imaging*

16. An important step that is ordinarily part of an expert's forensic examination of a computer involves attempting to create an electronic "image" of those parts of the computer that are likely to store the evidence, fruits, instrumentalities, or contraband relating to the applicable offense. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.

17. Special software, methodology and equipment are used to obtain forensic images. Among other things, forensic images normally are "hashed," that is, subjected to a mathematical

7

algorithm to the granularity of 1038 power, which is an incredibly large number that is much more accurate than the best DNA testing available today. The resulting number, known as a "hash value" confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

*Forensic Analysis*

18.     After obtaining a forensic image, the data will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

19.     Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software also can be very tedious. It can take days to properly search a single hard drive for specific data. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. The computer may have stored information about the data at issue: who created it; when it was created; when it was last accessed; when it was last modified; when was it last printed; and when it was deleted. Operation of the computer by non-forensic technicians effectively destroys this and other trace evidence.

20. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search for information in text format. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The contents of Adobe ".pdf" files are not searchable via keyword searches. The data is saved in a proprietary non-text format. Microsoft Outlook data is an example of a commonly used email program that stores data in a non-textual, proprietary manner–ordinary keyword searches will not reach this data. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic examiners, yet they are not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text.

21. Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has become mind-boggling. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 100 gigabytes of data and are commonplace in new desktop computers. And, this data may be stored in a variety of formats or encrypted. The sheer volume of data also has extended the time that it takes to analyze data in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Even perusing file structures can be laborious if the user is well-organized. Producing only a directory listing of a home computer can result in thousands of pages of printed material most of which likely will be of limited probative value.

22. Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques, and may take weeks or even months. Keywords need to be modified continuously

9

based upon the results obtained. Evidence in graphic file format must be laboriously reviewed by examiners. Criminals can mislabel and hide files and directories, use codes to avoid using keywords, encrypt files, deliberately misspell certain words, delete files, and take other steps to defeat law enforcement.

*Persistence of Digital Evidence*

23.     Computers store data, both on removable media (for example, CDs and floppy diskettes) and internal media, in ways that are not completely known or controlled by most users. Once stored, data is usually not destroyed until it is overwritten. For example, data that is "deleted" by a user is usually not actually deleted until it is overwritten by machine processes (rather than user decision) that decide where to store data and when overwriting will occur. Therefore, files and fragments of files and other data may easily last months, if not years, if the storage media is retained.

24.     Typically, computer forensics focuses on at least three categories of data. These are: 1) **active data** – such as current files on the computer, still visible in file directories and available to the software applications loaded on the computer; 2) **latent data** – such as deleted files and other data that resides on a computer's hard drive and other electronic media in areas available for data storage, but which are usually inaccessible without the use of specialized forensic tools and techniques; and 3) archival data – such as data which has been transferred or backed up to other media such as CDs, floppy disks, tapes, and ZIP disks.

25.     **Active data** includes not only files created by and with the user's knowledge, but also may include items such as Internet history log files, system registry files (listing all the systems and software applications installed on a computer, including the dates of installation, use, and deletion), and date/time file stamps automatically created that identify when files were created, modified, and last accessed.

26. **Latent data** includes data retained and stored on computer media in "unallocated" and "slack" space. Unallocated space refers to space on a hard drive that is available for the storage of new data. Slack space refers to any leftover space that remains when an active file is stored in particular location on the hard drive that is akin to an empty shelf in a closet containing other full shelves. Deleted files and other latent data that has not been overwritten by new data or files often may be accessed by a qualified forensic examiner from the unallocated and slack space on a computer user's hard drive months and years after such data was created by the user or the computer's operating system.

27. I know, based upon my training and experience, that a qualified forensic examiner may use knowledge of the mechanisms used to store electronic data to unlock and to uncover the activities of a computer's user years after the fact by examination of active, latent, and archival data. Through the use of proper computer forensic techniques such data and evidence of criminal offenses may be recovered, notwithstanding the passage of time since a crime occurred.

*Conclusion Regarding Forensic Analysis Procedures*

28. In light of these difficulties, I request permission for investigators to remove to a forensically-secure location the computers and computer-related equipment as instrumentality(ies) of the crimes, and to use whatever data analysis techniques reasonably appear necessary to locate and retrieve digital evidence within the scope of this warrant. Such action will greatly diminish the intrusion of law enforcement into the premises and will ensure that evidence can be searched for without the risk of losing, destroying or missing the information/data for which there has been authorization to search.

29. Therefore, it is respectfully requested that the warrant sought by this application authorize the search and seizure for all "computer hardware," "computer software" and documents,

11

which are more fully set-out and explained above, and further authorize a full physical and forensic examination of the seized items at a secure location.

## CONCLUSION

30.     I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT RESIDENCE** described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

31.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Peter Chiglinsky
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by reliable electronic means, specifically, FaceTime video conference, in accordance with Fed. R. Crim. P. 4.1, on July __2__, 2025.

_____
HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

12

**ATTACHMENT A**
**Property to Be Searched**

The property to be searched is 3738 Isabella Avenue, Cincinnati, Ohio 45209 pictured below and further described as a single-family residence. The exterior of the residence is a red brick siding with small covered front porch. There are green colored shutters surrounding the exterior windows. There is a number "3738" affixed to the front of the subject residence.

The authorization includes any safes or other containers found, whether locked or unlocked; any storage areas, garages, and/or outbuildings; and/or any vehicles located in the driveway/curtilage of the property.



## ATTACHMENT B

### Particular Things to be Seized

1. Computer(s), cellphone(s), tablet(s), computer hardware (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, diskettes, and other memory storage devices), computer software, computer related documentation, computer passwords and data security devices, which may contain evidence of the alleged offenses;

2. Any and all notes, documents, ledgers, bank account records, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the alleged offenses;

3. Any and all vehicles located at the subject residence which are identified as stolen;

4. 3-D printers or medium used to support 3-D printers which could be involved in the alleged offenses;

5. US currency possibly associated with the sale of stolen vehicles;

6. Counterfeit currency;

7. State identification cards, counterfeit automotive titles, counterfeit VINs;

8. Machines and tools used for the production of VIN plates and stickers;

9. Non-serialized/"ghost guns"